1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE PORTAL SOFTWARE, INC            No C-03-5138 VRW
     SECURITIES LITIGATION
12                                              ORDER
     _____/
13

14          Plaintiffs in this securities fraud class action face the

15   unenviable task of complying with the stringent pleading

16   requirements imposed on such actions.  All too frequently, and once

17   again here, plaintiffs attempt this endeavor by a complaint replete

18   with evidentiary detail, but only a loose (and the court thinks too

19   loose) connection between the wrongful conduct alleged and its

20   effect on the class.  The Supreme Court has recently reminded lower

21   federal courts that the heart of a fraud on a securities market is

22   the proximate causal link between the misstatement or omission

23   alleged and the resulting impact on the security's price.  Dura

24   Pharms Inc v Broudo, 125 S Ct 1627 (2005).  Despite the rather

25   forgiving interpretation of Dura in this circuit, see In re Daou

26   Systems, Inc Securities Litigation, 2005 WL 1431833 (9th Cir June

27   21, 2005), the operative pleading here fails to make this

28   connection.  Because plaintiffs will be allowed to amend, the court

emphasizes the need for plaintiff to allege facts that link defendants' alleged wrongdoing to the class injury.  A much shorter, but targeted, pleading may well be more effective in making this connection than the rather distended pleading now at bar.  But there are other shortcomings in their pleadings that plaintiffs need to address and it is to these that the court devotes the bulk of this order.

I

Plaintiff John Romeo (Romeo) and plaintiff Pipefitters Local 522 & 633 Pension Fund Trust (Pipefitters) (collectively, plaintiffs), purporting to represent investors who purchased securities of Portal Software Inc (Portal) between May 20, 2003, and November 13, 2003, inclusive (the "class period"), bring this action under the Securities Exchange Act of 1934 (the "'34 Act") and the Securities Act of 1933 (the "'33 Act").  Plaintiffs allege that defendants Portal, John Little (Little), Howard A Bain III (Bain) and Arthur C Patterson (Patterson) (collectively defendants) violated the Generally Accepted Accounting Principals (GAAP) by artificially inflating the price of Portal's stock and making false and misleading statements on which plaintiffs relied, thereby incurring substantial financial loss from purchasing Portal stock at fraudulently inflated prices.  Defendants' move  to dismiss (Doc #115) plaintiffs' third consolidated amended complaint (TCAC; Doc #111) for failure to meet the particularity requirement imposed by FRCP 9(b) and the Private Securities Litigation Reform Act (PSLRA)(amendments to the '33 and '34 Acts).  Plaintiffs oppose the motion, asserting that the TCAC states sufficiently particularized

**2**

claims under § 10(b) and § 20(a) of the '34 Act, as well as claims under §§ 11, 12(a)(2) and 15 of the '33 Act.

The court heard argument on these motions on July 7, 2005.  Based upon the parties' arguments and the applicable federal law, the court concludes that: (1) the allegations in plaintiffs' complaint are not pled with sufficient particularity under the PSLRA and FRCP 9(b); (2) the allegations are not sufficient to support a strong inference of scienter under the PSLRA; (3) defendants' forward-looking statements are protected by the PSLRA's safe harbor provision ; (4) claims under the '33 Act sound in fraud and therefore fail with the '34 Act claims.  Accordingly, the court GRANTS defendants' motion to dismiss in its entirety.


                                II

The factual and procedural history is derived from the TCAC and presumed true for purposes of this motion.  <u>Gompper v VISX, Inc</u>, 298 F3d 893, 895 (9th Cir 2002).  Portal provides billing and subscriber management solutions to its clients primarily through its "Infranet" software.  Portal charges companies "license fees" for the Infranet product, as well as "service fees" for system implementation, consulting, maintenance and training.  Prior to 2001, the majority of Portal's customer base consisted of "dot-com" start-up companies.  Following the dot-com market crash of 2001, Portal lost many of its customers and incurred financial losses during fiscal 2002-2003 that wiped out more than 96% of Portal's equity.  Portal subsequently began to market its Infranet product to more established and sophisticated business customers, including telecommunications providers.

These new clients required greater customization of the software than had the dot-com startups, which in turn affected the way in which Portal could recognize license fee revenues. Pursuant to GAAP, if a software provider rewrites portions of its product to conform to a client's unique needs, it may not fully recognize the revenue on the license of software until such substantial modification has been performed. Whereas Portal had historically been able to recognize revenue at the time it delivered its Infranet product to the dot-coms, the greater customization required by these new, more established clients required Portal to defer recognizing revenue from much of its contracts until customization was complete. Plaintiffs allege that during the class period, Portal began to manipulate its license fees so it could recognize more revenue "up-front." TCAC at ¶¶ 41-42.

To support their allegations that Portal improperly recognized revenue prematurely and in violation of GAAP, plaintiffs rely on information from four unnamed former Portal employees: (1) a controller; (2) a "Senior Business Analyst'" (3) an accounts receivable and revenue assurance assistant; and (4) a "Senior Marketing Manager." TCAC at ¶¶ 41-54. The first three employees detail three different methods of accounting fraud allegedly undertaken by Portal management during the class period, while the Senior Marketing Manager alleges ongoing product problems and a decreasing market for key elements of Portal's software offering.

The information provided by the former controller involved Portal's method for recognizing licensing revenue. Historically, Portal preliminarily offered its customers a "developmental license," which consisted of a trial version of the

**4**

United States District Court

For the Northern District of California

software for a few key employees.  Portal would charge only a "nominal" amount for this first license.  Then, if the client wished to obtain the full Infranet product, Portal would sell the client a "production license" and charge for the bulk of the contract.  After fiscal 2004, plaintiffs allege that Portal simply charged a greater portion of the contract price under the developmental license, even though it was still only a trial version and significant modifications yet were to be performed under the production license.  Plaintiffs also allege that Portal's outside accountants, Ernst & Young, disapproved of this new split license arrangement and reversed Portal's position, a determination which ultimately caused the shortfall in earnings and resulting stock price decline.  TCAC at ¶ 43.

Next, the former Senior Business Analyst asserts that he was instructed by company officials, including Bain, to falsify revenue recognition studies to justify premature recognition of revenue.  Under GAAP, when a software contract provides for both licensing and services, such as software modification and implementation, the revenue from each element can only be recognized as it is performed, so long as the "fair value" of each element is determinable.  If the fair value of each element is not determinable, than recognition of the entire contract must be deferred until all elements have been delivered, or until such time as the fair value of the remaining elements are determinable.  The Senior Business Analyst avers that when attempting to discern the fair value of elements of a software arrangement, he was directed by the management to "reverse engineer" the study to reach predetermined results.  This employee, who ceased employment

United States District Court

For the Northern District of California

several months before the end of the class period, alleges that he was instructed to falsify revenue recognition studies with regard to contracts performed in "Greece, Italy, Columbia [sic] and Spain," including a contract with "Columbia [sic] Mobile."  TCAC at ¶ 48.

The third former employee on whom Plaintiffs rely is an accounts receivable and revenue assurance assistant employed during the class period.  She alleges that "revenues related to [Portal's] contracts with Onstar ... [were] materially overstated during the third quarter of fiscal 2004."  TCAC at ¶ 49.  Specifically, the former employee alleges that Portal would recognize revenue from the support, maintenance and upgrade elements of the software contract, even though the work had not yet been performed.  This employee asserts that she obtained this knowledge because one of her duties of employment was to reclassify the prematurely recognized revenue for future quarters.  She claims that she talked to her manager about her concerns with the way Portal was classifying revenue, and was subsequently dismissed from her position.  TCAC at ¶ 49.

Finally, plaintiffs proffer the testimony of a Senior Marketing Manager to substantiate their allegations that Portal was misrepresenting the demand for its product and concealing significant technical problems with its applications.  Specifically, the marketing employee stated that portions of Portal's billing software were being rendered obsolete by Customer Relationship Management (CRM) applications sold by vendors like SAP and Siebel.  TCAC at ¶¶ 51-52.  Moreover, Portal's Infranet product was having difficulty interfacing with these CRM applications,

6

resulting in unexpected costs and delays for Portal.  TCAC at ¶¶
53-54.  Plaintiffs allege that Portal's management failed to
disclose these technical difficulties and the declining demand for
Portal's product during the class period, thus concealing the true
state of Portal's financial health.

Plaintiffs' complaint alleges that the accounting fraud
described above was undertaken by defendants to inflate Portal's
reported revenue numbers, which were then used by defendants to
create false and misleading statements regarding Portal's financial
health and future business prospects.  According to plaintiffs,
these false and misleading statements artificially inflated
Portal's stock price and allowed defendants to complete a $60
million secondary offering on September 12, 2003.  Plaintiffs'
claims for violations of the '33 Act are based on alleged false and
misleading statements made in the registration statement and
prospectus issued in connection with the secondary offering.  TCAC
at ¶¶ 142-165.  Plaintiffs' claims for violations of the '34 Act
are based on alleged false and misleading statements disseminated
to the investing public via SEC filings and press releases. TCAC at
¶¶ 166-181.

After the close of the market on November 13, 2003,
defendants announced that -- due to contract delays, revenue
recognition deferrals and service execution issues -- Portal
expected net losses of $0.36 to $0.40 per share for the third
quarter fiscal 2004.  These losses were in contrast to the net
profits of $0.04 per share that Portal had previously projected for
the quarter.  Subsequent to the November 11, 2003, announcement,
the price of Portal's common shares plummeted 42% to $8.77 in after

7

United States District Court

For the Northern District of California

1   hours trading.   TCAC at ¶ 75.   Plaintiffs allege that this decline
2   in Portal's stock price at the end of the class period was "a
3   direct result of the nature and extent of [d]efendant's prior
4   misrepresentations, omissions and fraudulent conduct concerning
5   [Portal's] adverse business and financial conditions finally being
6   revealed to investors and the market" and that plaintiffs "were
7   damaged as a proximate result thereof."   TCAC at ¶ 76.

8

9                                  III

10              As a preliminary matter, the court considers defendants'
11   request for judicial notice (RJN, Doc #119) regarding certain
12   documents attached to the declaration of Randolph Gaw in support of
13   defendants' motion (Gaw Decl, Doc #116).   Defendants contend that
14   all the documents so attached are the proper subject of judicial
15   notice pursuant to FRE 201.

16              Exhibits N through U to the Gaw declaration are Form 4s
17   filed with the SEC regarding the stock sales of the individual
18   defendants and other corporate officers and directors, while
19   exhibits A through H are the SEC filings of defendant Portal.
20   Defendants contend that the court is authorized to take judicial
21   notice of documents filed with the SEC.   The court agrees that
22   judicial notice of such documents is proper.   See, e g, <u>Bryant v</u>
23   <u>Avado Brands, Inc</u>, 187 F3d 1271, 1276 (11th Cir 1999); <u>Allison v</u>
24   <u>Brooktree Corp</u>, 999 F Supp 1342, 1352 n3 (SD Cal 1998).   This
25   conclusion is bolstered by the fact that courts are specifically
26   authorized, in connection with a motion to dismiss a securities
27   fraud complaint, to consider documents and filings described in the
28   complaint under the incorporation by reference doctrine.   See, e g,

<u>Ronconi v Larkin</u>, 253 F3d 423, 427 (9th Cir 2001); <u>In re Silicon</u> <u>Graphics Securities Litigation</u>, 183 F3d 970, 986 (9th Cir 1999). Thus, the court takes notice of all the documents attached to the Gaw declaration that were filed with the SEC.

Exhibits I through M are Portal press releases, which defendants claim contain "safe harbor" warnings regarding any forward-looking statements in the press releases.  Judicial notice of these exhibits is proper because the court is required to consider "any cautionary statement accompanying [a] forward-looking statement, which [is] not subject to material dispute, cited by the defendant."  15 USC § 78u-5(e).  In addition, the court may take judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements.  See <u>In re The First Union Corp Securities</u> <u>Litigation</u>, 128 F Supp 871, 883 (WD NC 2001). This is true of press releases, even if they were not explicitly referenced in the complaint.  See <u>Wietschner v Monterey Pasta Co.</u>, 294 F Supp 2d 1102, 1108-09 (ND Cal 2003).

Exhibit V to the Gaw declaration is the "Statement of Position 97-2 Software Revenue Recognition."  This is an accounting statement issued by the American Institute of Certified Public Accountants.  RJN Doc #19 at 4.  Courts may take judicial notice of documents that are alleged in the complaint and whose authenticity no party questions, even when not attached to the complaint.  See <u>Branch v Tunnell</u>, 14 F3d 449, 454 (9th Cir 1994).

Finally, at oral argument on July 7, 2005, plaintiffs submitted to the court three additional documents and requested that the court take judicial notice of them in considering this

1  motion.  Doc #130.  These documents include (1) a Portal press

2  release dated June 30, 2005; (2) Portal's Form 8-K filed with the

3  SEC on June 27, 2005; and (3) Portal's Form 10-Q for the quarter

4  ending October 31, 2004, filed with the SEC on April 25, 2005.  Id.

5  The court takes notice of these documents, which are all public

6  filings capable of judicial notice.

7

8                                  IV

9                          *Standard of Review*

10          FRCP 12(b)(6) motions to dismiss essentially "test

11  whether a cognizable claim has been pleaded in the complaint."

12  Scheid v Fanny Farmer Candy Shops, Inc, 859 F2d 434, 436 (6th Cir

13  1988).  FRCP 8(a), which states that plaintiff's pleadings must

14  contain "a short and plain statement of the claim showing that the

15  pleader is entitled to relief," provides the standard for judging

16  whether such a cognizable claim exists.  Lee v City of Los Angeles,

17  250 F3d 668, 679 (9th Cir 2001).  This standard is a liberal one

18  that does not require plaintiff to set forth all the factual

19  details of his claim; rather, all that the standard requires is

20  that plaintiff give defendant fair notice of the claim and the

21  grounds for making that claim.  Leatherman v Tarrant County

22  Narcotics Intell & Coord Unit, 507 US 163, 168 (1993) (citing

23  Conley v Gibson, 355 US 41, 47 (1957)).  To this end, plaintiff's

24  complaint should set forth "either direct or inferential

25  allegations with respect to all the material elements of the

26  claim".  Wittstock v Van Sile, Inc, 330 F3d 899, 902 (6th Cir

27  2003).

28          Under Rule 12(b)(6), a complaint "should not be dismissed

                                   10

United States District Court

For the Northern District of California

for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Hughes v Rowe, 449 US 5, 9 (1980) (citing Haines v Kerner, 404 US 519, 520 (1972)); see also Conley, 355 US at 45-46.  All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff.  See Silicon Graphics, 183 F3d at 980 n10.  But "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Sprewell v Golden State Warriors, 266 F3d 979, 988 (9th Cir 2001) (citing Clegg v Cult Awareness Network, 18 F3d 752, 754-55 (9th Cir 1994)).

Review of a FRCP 12(b)(6) motion to dismiss is generally limited to the contents of the complaint, and the court may not consider other documents outside the pleadings.  Arpin v Santa Clara Valley Transportation Agency, 261 F3d 912, 925 (9th Cir 2001).  The court may, however, consider documents attached to the complaint.  Parks School of Business, Inc v Symington, 51 F3d 1480, 1484 (9th Cir 1995).  If a plaintiff fails to attach to the complaint the documents on which the complaint is based, a defendant may attach such documents to its motion to dismiss for the purpose of showing that the documents do not support plaintiff's claim.  In re Autodesk, Inc Securities Litigation, 132 F Supp 2d 833, 837 (ND Cal 2000) (citing Branch v Tunnel, 14 F3d 449, 454 (9th Cir 1994)).  This permits the court to consider the full text of a document that the plaintiff's complaint only partially quotes.  Autodesk, 132 F Supp 2d at 838 (citing In re Stac Electronics Securities Litigation, 89 F3d 1399, 1405 n4 (9th Cir

United States District Court

For the Northern District of California

1996), cert denied, 520 US 1103 (1997)).  Additionally, "[t]he court need not * * * accept as true allegations that contradict matters properly subject to judicial notice * * *."  <u>Sprewell</u>, 266 F3d at 988 (citing <u>Mullis v United States Bankr Ct</u>, 828 F2d 1385, 1388 (9th Cir 1987)).

But these liberal pleading standards described above have been substantially tightened in the context of securities litigation, as will be discussed <u>infra</u>.

V

The TCAC alleges five causes of action.  For the first and second causes of action, plaintiffs allege violations of sections 11 and 12(a)(2) of the '33 Act against all defendants.  Plaintiffs' first and second causes of action are based on the registration statement Portal filed for its secondary public offering (SPO) in September 2003.  Plaintiffs' third cause of action alleges control liability under section 15 of the '33 Act against Little, Bain and Patterson (the "individual defendants").  Plaintiffs' fourth cause of action alleges violations of section 10(b) of the '34 Act and Rule 10b-5 promulgated thereunder against all defendants.  Lastly, plaintiffs allege control liability under section 20(a) of the '34 Act against the individual defendants.  The court will first address first plaintiffs' claims under the '34 Act before turning to the claims brought under the '33 Act.

//

//

//

//

12

A

*Section 10(b) and 20(a) of the Exchange Act of 1934*

Section 10(b) of the '34 Act and SEC Rule 10b-5, promulgated thereunder, make it unlawful for any person, in connection with the purchase or sale of any security, to (1) engage in fraud or (2) make an untrue statement regarding a material fact or (3) make a misleading statement by omitting a material fact. 15 U.S.C. § 78j(b); 17 CFR § 240.10b-5. Consequently, the elements of a Rule 10b-5 claim are:  (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.  See <u>Dura</u>, 125 S Ct at 1633.

Claims brought under Section 10(b) and Rule 10b-5 must first meet the particularity requirements of FRCP 9(b).  <u>In re Stac</u>, 89 F3d at 1404; see also <u>In re GlenFed Inc Securities Litigation</u>, 42 F3d 1541, 1545 (9th Cir 1994) (en banc).  Rule 9(b) requires a plaintiff alleging fraud to "set forth what is false or misleading about [the] statement[] and why it is false." <u>GlenFed</u>, 42 F3d at 1548.

Second, a complaint must satisfy the more stringent requirements imposed on securities fraud pleadings by the PSLRA. Specifically, the PSLRA requires that a complaint: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading * * *" (15 USC § 78u-4(b)(1)); (2) with respect to any such allegations based upon information and belief, "state with particularity all facts on which that belief is formed" (15 USC § 78u-4(b)(1)); and (3) "with respect to each act or omission * * * state with particularity

13

facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 USC § 17u-4(b)(2)).  The required state of mind, or scienter, is met where the complaint alleges that the defendants made the false or misleading statements either <u>intentionally or with deliberate recklessness</u>."  <u>In re Daou Systems, Inc Securities Litigation</u>, 2005 WL 1431833 (9th Cir June 21, 2005)(citing <u>Silicon Graphics</u>, 183 F3d at 974) (emphasis added).  In securities cases, falsity and scienter "are generally inferred from the same set of facts and the two requirements may be combined into a unitary inquiry under the PSLRA."  <u>In re Vantive Corp Securities Litigation</u>, 283 F3d 1079, 1091 (9th Cir 2002) (citations omitted).

Even if plaintiffs meet these heightened pleading requirements, however, the PSLRA carves out a safe harbor from liability if the alleged false or misleading statements were forward-looking and accompanied by meaningful risk warnings.  15 USC § 78u-5(c); see also <u>In re Splash Technology Holdings, Inc Securities Litigation</u>, 2000 US Dist LEXIS 15369, *16 (ND Cal) (<u>Splash I</u>).  An analogous doctrine (which predates the enactment of the PSLRA) is the "bespeaks caution" doctrine, which allows a court to rule as a matter of law that defendant's forward-looking statements contained enough cautionary language or risk disclosure to protect against liability.  See, e g, <u>Provenz v Miller</u>, 102 F3d 1478, 1493 (9th Cir 1996).  If a defendant's statements are immunized under either doctrine, dismissal of the complaint is appropriate.  See id; <u>Splash I</u>, 2000 US Dist LEXIS at *29.

Defendants challenge the sufficiency of plaintiffs' '34 Act claims on several grounds:  (1) plaintiffs' complaint lacks the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  specificity needed to plead accounting fraud; (2) plaintiffs fail

2  to plead facts raising a strong inference of scienter; and (3)

3  defendants' statements are protected by the PSLRA's safe harbor

4  provision.  Before turning to the issue of safe harbor, the court

5  will address the defendants' first two contentions under the

6  "unitary inquiry" advocated in this circuit, as "falsity and

7  scienter are generally inferred from the same set of facts * * *."

8  In re Vantive, 283 F3d at 1091.

9

10                                    1

11         Defendants contend that the TCAC should be dismissed

12  because plaintiffs have not adequately pled facts to support their

13  allegations of accounting fraud or to support a strong inference of

14  scienter.  "If properly pled, overstating of revenues may state a

15  claim for securities fraud, as under GAAP, revenue must be earned

16  before it can be recognized."  In re Daou, 2005 WL 141833 at *5

17  (citations omitted) (emphasis in original).  Plaintiffs must plead

18  facts sufficient to support a conclusion that defendants "prepared

19  the fraudulent financial statements and that the alleged financial

20  fraud was material."  See id (quoting In re Peerless Systems, Corp

21  Securities Litigation, 182 F Supp 2d 982, 991 (SD Cal 2002).

22         Although violations of GAAP standards may provide

23  evidence of scienter, see id, the complaint must allege GAAP

24  violations with sufficient particularity to support a strong

25  inference of scienter.  See, e g, In re McKesson HBOC, Inc

26  Securities Litigation, 126 F Supp 2d 1248, 1273 (ND Cal 2000)

27  ("[w]hen significant GAAP violations are described with

28  particularity in the complaint, they may provide powerful indirect

                                      15

United States District Court

For the Northern District of California

1    evidence of scienter.  After all, books do not cook themselves.".)

2    The inquiry focuses on the specificity of the allegations; "a

3    general allegation that the practices at issue resulted in a false

4    report of company earnings is not a sufficiently particular claim

5    of misrepresentation."  In re Daou, 2005 WL 1431833 at *5 (quoting

6    Greebel v FTP Software, Inc, 194 F3d 185, 203-04 (1st Cir 1999).

7            The Ninth Circuit recently instructed that complaints

8    stating sufficiently particular accounting irregularities should

9    include: "(1) such basic details as the approximate amount by which

10   revenues and earnings were overstated; (2) the products involved in

11   the contingent transaction; (3) the dates of any of the

12   transactions; or (4) the identities of any of the customers or

13   [company] employees involved in the transactions."  In re Daou,

14   2005 WL 1431833 at *6 (citations and internal quotation marks

15   omitted).  Although the complaint need not provide each and every

16   detail described above, it should enable a court to determine

17   whether the alleged fraud "constituted widespread and significant

18   inflation of revenue."  Id.

19           Before reaching the substance of plaintiffs' complaint,

20   the court notes that plaintiffs' allegations are derived, in large

21   part, from information provided by confidential witnesses.  The

22   Ninth Circuit requires a particular inquiry to determine if the use

23   of such confidential sources satisfies the PSLRA.  See In re Daou,

24   2005 WL 1431833 at *4.  The inquiry focuses on whether unnamed

25   sources of information in the complaint are described "with

26   sufficient particularity to support the probability that a person

27   in the position occupied by the source would possess the

28   information alleged."  Nursing Home Pension Fund, Local 114 v

United States District Court

For the Northern District of California

Oracle Corp, 380 F3d 1226, 1233 (9th Cir 2001) (quoting Novak v Kasaks, 216 F3d 300, 314 (2d Cir 2000)).  These personal sources need not be named so long as the information they provide is adequately corroborated by other facts.  Silicon Graphics, 183 F3d at 985.

In In re Daou, the Ninth Circuit recently adopted the First Circuit's "suggested criteria for assessing reliability of confidential witnesses."  In re Daou, 2005 WL 1431833 at *4.  These criteria include "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  In re Cabletron Sys Inc, 311 F3d 11, 29 (1st Cir 2002).  Moreover, when a complaint relies on unnamed employees, courts generally look for specific descriptions of the employee's relevant duties and responsibilities to evaluate the reliability of their information.  See, e g, In re Daou, 2005 WL 1431833 at *4 (finding that confidential witnesses were described with a "large degree of particularity" where, in all cases, their job description and responsibilities were delineated, and in some cases, plaintiffs identified the executive to whom the employee reported); see also In re Northpoint Communications Group, Inc, 221 F Supp 2d 1090, 1097 (ND Cal 2002)(holding that a second amended complaint cured some specificity problems of original complaint where it set out, in addition to job titles and tenure of confidential witnesses, their responsibilities at the company).

The TCAC relies in large part upon information provided by three unnamed former Portal employees to substantiate

United States District Court

For the Northern District of California

1   allegations that defendants were engaging in accounting fraud in

2   order to overstate revenue.  Plaintiffs identify these employees by

3   either their titles or their positions in the company, but

4   generally fail to describe with any particularity the duties of

5   each employee, or how or why they came to be familiar with the

6   information they provide.  Despite plaintiffs' failure to specify

7   each employee's duties, in some cases the employees' accounts

8   themselves describe their relevant duties in the course of relating

9   elements of the alleged accounting fraud.  Consequently, the court

10  cannot adopt wholesale the allegations provided by the unnamed

11  employees in plaintiffs' complaint.  Rather, in determining whether

12  the TCAC adequately pleads violations of the securities laws, the

13  court will rely only on factual allegations which evince

14  reliability through detail, context and corroboration.

15          With these legal principles in mind, the court turns to

16  plaintiffs' allegation that Portal engaged in accounting fraud by

17  falsely inflating revenues to conceal Portal's precarious financial

18  condition.  Specifically, plaintiffs allege that defendants

19  prematurely recognized revenue by (1) improperly categorizing

20  licensing revenue, (2) overstating purported billing rates to

21  recognize greater costs on delivered elements of a contract, (3)

22  manipulating the fair value amount attributable to undelivered

23  items and (4) recognizing revenue before project milestones were

24  approved by customers.

25          Plaintiffs allege that defendants manipulated license

26  agreements into two parts and improperly priced the first part of

27  the license with the bulk of the contract fee so that they could

28  recognize the revenue prematurely.  TCAC ¶¶ 41-43.  In support of

18

United States District Court

For the Northern District of California

1   this allegation, plaintiffs rely entirely on information provided

2   by a former controller.  Id.  Yet, the former controller's account

3   does not contain inherent indicia of reliability.  First, her

4   employment with Portal ended almost a year before the class period

5   even began.  TCAC ¶ 41.  Consequently, her entire account of

6   Portal's fraudulent revenue recognition practices during the class

7   period are based on second-hand reports from company "insiders."

8   Id ¶ 43.  Although she has personal knowledge to support her

9   descriptions of Portal's revenue recognition practices <u>prior</u> to the

10  class period, it is the allegations that Portal made fraudulent

11  changes to these recognition practices during the class period that

12  require "a reasonable conviction in the informant's basis of

13  knowledge."  <u>In re NorthPoint</u>, 221 F Supp 2d at 1097.  Hence,

14  plaintiffs must describe the job title, job description, duties,

15  and dates of employment for the <u>controller's</u> <u>sources</u> before this

16  information can be deemed reliable.  Plaintiffs have made no

17  attempt to provide such information about any of the controller's

18  "insiders," and consequently, plaintiffs' allegations regarding

19  improperly bifurcated contracts are not pled with sufficient

20  particularity.

21          Plaintiffs' next allegations -- that defendants "cooked"

22  revenue numbers to recognize revenue prematurely -- are somewhat

23  better supported.  The TCAC identifies a "Senior Business Analyst"

24  who worked at Portal until July 2003, two months into the class

25  period.  Although the complaint again fails specifically to

26  describe this employee's job duties, to whom he reported, or in

27  which department he worked, his account ameliorates the shortfall.

28  As part of his employment, the analyst asserts that he was required

1  to "reverse engineer" revenue recognition studies to reach a

2  predetermined result.  TCAC ¶ 45.  Moreover, the analyst asserts

3  that he was personally directed to create these false studies by

4  defendant Bain, the CFO.  Id ¶ 47.  These fabrications involved

5  falsely selecting high billing rates to inflate revenues for work

6  already performed on contracts (Id ¶ 46) or falsely calculating a

7  low value for undelivered elements so that greater revenue could be

8  attributed to the elements already delivered (Id ¶ 47).

9       Although the Senior Business Analyst only identifies one

10  customer by name for whom he created false revenue recognition

11  studies (Columbia Mobile), he alleges that he was "required to

12  perform analyses that matched management's predetermined results

13  for work performed in * * * Greece, Italy, Columbia and Spain in

14  connection with at least six of Portal's major contracts" and that

15  Portal booked $5 million in revenue as a result of these contracts.

16  Id ¶ 48.  Based on his personal involvement in fraudulent activity

17  at the behest of Bain, the court concludes that these allegations

18  potentially support a claim under the '34 Act.  Moreover, the court

19  finds that the specificity of the account indicates a level of

20  reliability.  Yet because the analyst's account provides no

21  indication of how these alleged manipulations affected Portal's

22  financial earnings statements, further corroboration is necessary

23  to meet the heightened pleading requirements of the PSLRA.

24       Next, the TCAC alleges that defendants engaged in

25  improper revenue recognition through testimony of an accounts

26  receivable and revenue assurance assistant who allegedly worked at

27  Portal during the class period.  TCAC ¶ 49.  Again, this employee's

28  account self-identifies her duties and basis for knowledge,

mitigating the TCAC's failure to do so.  For example, the assistant
specifies that "one of [her] duties was to reclassify revenue for
future quarters."  Id ¶ 49.  It was through this work, she alleges,
that she came to learn that Portal was improperly recognizing
revenue from software licensing contracts.  Id.  The assistant
explains her basis for knowledge: "I have been working with revenue
recognition for 12 years, and I understand the way revenue is
supposed to be recognized."  Id.   The assistant's account also
alleges a particular contract, with Onstar, for which Portal
"materially overstated [revenues] during the third quarter of
fiscal 2004."  TCAC ¶ 49.

In the Ninth Circuit, "although overstatement of revenues
in violation of GAAP may support a plaintiff's claim of fraud, the
plaintiff must show with particularity how the adjustments affected
the company's financial statements and whether they were material
in light of the company's overall financial position."  In re Daou,
2005 WL 1431833 at *7.  In In re Daou, the panel found that the
plaintiff adequately described how "allegedly premature [revenue]
recognition affected Daou's financial bottom line" where the
complaint pled "the approximate amount by which revenues and
earnings were overstated, * * * the dates of some of the
transactions and the identities of the customers and the company
employees involved in the transactions."  Id at *8.  For example,
the plaintiffs in In re Daou alleged that only $5.9 million was
eligible for recognition in the third quarter of 1997, 48% less
than the $11.3 million that Daou publicly reported.  Id.

In contrast, the TCAC is bereft of such comparisons.
Only the Senior Business Analyst alleges a dollar amount -- $5

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10

million -- for prematurely recognized revenue.  Even this figure is unconnected to identified customers or dates, much less a specific quarterly report against which to assess its materiality.  Although the accounts receivable assistant allegedly reclassified improperly booked revenues, she does not indicate how much revenue was reclassified or how this affected Portal's financial statements.  The controller's statements, lacking in personal knowledge, also fail to specify how much revenue the allegedly improper licensing contracts allowed Portal to recognize prematurely, and how that affected Portal's bottom line.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

          The TCAC also alleges that defendants engaged in accounting fraud by recognizing "license and service fees under * * * service arrangements prior to customer approval of specific project milestones in violation of the Company's publicly stated revenue recognition practices and policies" and in violation of GAAP.  TCAC ¶ 50.   To support this allegation, plaintiffs refer only to defendants' disclosure, subsequent to the class period, that it was excluding $700,000 of previously reported revenue for fiscal 2004 due to a customer's refusal to approve project milestones.  TCAC ¶ 84.   Defendants argue that this disclosure related to a contract performed after the class period, but plaintiffs provide information indicating the restatement related to fiscal 2004.  TCAC ¶ 84.   Even assuming this revenue was originally announced during the class period, the court finds that plaintiffs' single example of defendants announcement of revenue prior to customer approval does not raise a strong inference of scienter.

28

          Plaintiffs allege that defendants also violated the '34

United States District Court
For the Northern District of California

1  Act by materially misrepresenting the declining demand for Portal's
2  products and services and failing to disclose severe interface
3  problems that delayed delivery and increased costs.  TCAC ¶¶ 51-54.
4  Support for this allegation, however, comes from only one unnamed
5  employee, a Senior Marketing Manager, who worked for only two
6  months of the class period.  From this employee's title, the court
7  might infer such a position would afford knowledge of the market
8  for Portal's product.  Thus, this account could conceivably provide
9  evidence of the "shrinking market and role for billing software
10 applications."  Id ¶ 52.  In addition, the employee identifies two
11 vendors, SAP and Siebel, that offered products that "displaced the
12 role previously provided" by aspects of Portal's billing software.
13 Id ¶ 51.  But the specificity ends there.  The employee fails to
14 identify any of "Portal's large telecommunications customers" for
15 whom customer service applications were no longer required as part
16 of Portal's billing software.  Id.  And, although the marketing
17 manager alleges that Portal was spending too much time and money
18 due to "excessive bugs and/or interface problems with other
19 applications," these allegations fail to indicate any specific
20 customers, contracts, or dates.  Id ¶ 54.

21      The court finds that plaintiffs' allegations of
22 accounting fraud and material misrepresentations are not pled with
23 sufficient particularity and, consequently, do no raise a strong
24 inference of scienter.  Plaintiffs, however, present an alternative
25 basis for demonstrating scienter; the complaint focuses on
26 defendants' stock sales and Portal's SPO to show that defendants
27 had the motive and opportunity to mislead investors deliberately.
28 As discussed in the next section, however, these allegations fail

23

United States District Court

For the Northern District of California

1    to plead a violation of section 10(b) adequately.

2

3                                    **2**

4                                *Scienter*

5             To demonstrate motive, plaintiffs allege that defendants

6    engaged in insider trading during the class period.  The PSLRA

7    "neither prohibits nor endorses the pleading of insider trading as

8    evidence of scienter, but requires that the evidence meet the

9    'strong inference' standard."  Greebel, 194 F3d at 197.  While

10   "trading at suspicious times or in suspicious amounts" is probative

11   of scienter, the trading must be "unusual, well beyond the normal

12   patterns of trading by those defendants."  Id.   Under this

13   standard, the court questions plaintiffs' reliance on the stock

14   sales attributable to "company insiders" to demonstrate defendants'

15   motive to conduct accounting fraud or issue misleading statements.

16   First, defendant Little sold no personal stock.  Defendant Bain

17   sold 4,000 shares after exercising 7,500 stock options, which means

18   he did not sell 3,500 shares.

19           Plaintiffs focus on "89,157 shares of Portal common

20   stock" sold by "Portal insiders."  TCAC at ¶ 65.  Most of these

21   "insiders," however, are not named defendants, nor do plaintiffs

22   allege they were involved in the fraudulent activity.  Moreover,

23   plaintiffs' reliance on "suspicious" stock sales ultimately fails

24   because the stock sales do not appear suspicious at all.  For

25   example, plaintiffs focus on the period from May 28, 2003, to July

26   2, 2003, which was "immediately after" the first earnings

27   announcement of the class period -- but also after the announcement

28   of an alliance with Microsoft.  TCAC at ¶ 65.  Although plaintiffs

1  allege that Portal common stock was artificially inflated during

2  this period, they do not allege that the deal with Microsoft was

3  improper.  In fact, plaintiffs ignore the legitimate, positive

4  effect the Microsoft deal might have had on Portal's stock or the

5  role the Microsoft deal might have had in the executives' decision

6  to sell.  No attempt is made to delineate the "artificiality" of

7  Portal's stock during this period, which is especially curious

8  since it appears that Portal's stock actually <u>dropped</u> by several

9  dollars after the first earnings announcement of the class period.

10  TCAC at ¶ 140 (Charting NASDAQ Index).  Moreover, plaintiffs fail

11  to demonstrate that the timing of the stock sales was "suspicious"

12  where the TCAC does not provide a comparison of these sales with

13  the executives' "normal patterns of trading."  <u>Greebel</u>, 194 F3d at

14  197.

15        By contrast, plaintiffs' contention that defendants were

16  motivated to inflate artificially Portal's stock price in the short

17  term in order to conduct a successful secondary public offering and

18  obtain much-needed operating capital does allege facts of a

19  palpable motive for fraud.  In fact, Portal raised $60 million in

20  September, just two months before Portal's stock plummeted by over

21  40%.  Plaintiffs allege that Portal's finances were such that the

22  $60 million was absolutely necessary to keep Portal a "going

23  concern."  Plaintiffs' Opposition at 21.  Accordingly, this motive

24  evidence is stronger than the generic "desire to raise capital"

25  which can be attributed to every company.  <u>Metricom</u>, 2004 US Dist

26  LEXIS 7834 at *110.  But in the Ninth Circuit, such motive pleading

27  must be combined with allegations of other "red flags" to be

28  probable.  <u>In re Vantive</u>, 283 F3d at 1097.  As discussed above,

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

plaintiffs' allegations of accounting fraud lack sufficient
particularity and cannot be combined with this alleged motive to
establish a strong inference of scienter.

**3**

*Safe Harbor*

In their motion to dismiss, defendants argue at great
length that plaintiffs' TCAC does not adequately plead claims based
on false projections or opinions.  Defendants are correct that the
PSLRA carves out a safe harbor from liability for forward-looking
statements that are accompanied by meaningful cautionary language.
15 USC § 78u-5(c); see also <u>In re Copper Mountain Securities
Litigation</u>, 311 F Supp 2d 857, 866 (ND Cal 2004)(Walker, J).  Under
the analogous "bespeaks caution" doctrine, a court may also find as
a matter of law that "defendant's forward-looking statements
contained enough cautionary language or risk disclosure to protect
against liability."  Id at 866.  Mere boilerplate or generic
warnings, however, are insufficient; "[t]he cautionary warning
ought to be precise and relate directly to the forward-looking
statements at issue."  Id at 882.  Moreover, this court has
previously found that "vague and * * * run-of-the-mill corporate
optimism" is not actionable because no reasonable investor would
rely on "mere puffery."  Id at 868-69.

A close reading of plaintiffs' TCAC reveals that the vast
majority of plaintiffs' allegations of "materially false and
misleading statements" focus on defendants' statements regarding
present or historical facts, such as Portal's past quarterly
earnings based on (1) allegedly inflated revenues (TCAC ¶¶ 58, 60,

United States District Court

For the Northern District of California

64, 66, 67); (2) Portal's past and current revenue recognition policies that plaintiffs allege misrepresented the way in which Portal was recognizing revenue (TCAC ¶¶ 61-64, 68-70); (3) omissions of past and current facts regarding declining sales and product demand as well as difficulties marketing Portal's product (TCAC ¶ 64e-f); and (4) omissions of the present fact that Portal was experiencing severe technical problems with its core products, which were eroding its revenue stream (TCAC ¶ 64g).  But neither the PSLRA's safe harbor provision nor the bespeaks caution doctrine are applicable to statements of historical fact.  See e g, <u>Livid Holdings Ltd v Salomon Smith Barney, Inc</u>, 403 F3d 1050, 1056-57 (9th Cir 2005).

In fact, the only forward-looking statements that plaintiffs allege were false or misleading when made are the revenue projections for fiscal 2004 and the subsequent quarter's revenue projections that accompanied Portal's public announcement of financial results for the quarter just concluded.  See TCAC ¶ 58 (May 20, 2003, announcement of financial results for quarter ending May 2, 2003); TCAC ¶ 66 (August 19, 2003, announcement of financial results for quarter ending August 1, 2003).  These announcements were made in press releases and included defendants' statements that Portal expected revenues to grow by "10-12%" over the prior year and that Portal would "return to pro forma earnings" within the current fiscal year.  TCAC ¶ 58.

Both of these statements concerned "a projection of revenues" and "future economic performance" and thus were clearly forward-looking statements under the PSLRA.  15 USC § 78u-5(i); <u>Copper Mountain</u>, 311 F Supp 2d at 880.  The court now turns to

27

United States District Court

For the Northern District of California

1  plaintiffs' argument that defendants' forward-looking statements
2  are unprotected by the PSLRA's safe harbor provision or the
3  bespeaks caution doctrine because (1) the statements were not
4  accompanied by meaningful cautionary language and (2) defendants
5  knew they were false when made.

6        The court finds that defendants' forward-looking
7  statements were accompanied by cautionary language that was
8  sufficiently specific and meaningful to warn investors of the risks
9  that actually materialized.  First, defendants' May 20 and August
10 19 press releases -- which contained the 10-12% profit projection
11 and "return to pro forma earnings" statements -- each included
12 "safe harbor" warnings that the statements were forward-looking and
13 subject to uncertainties and risk.  Gaw Decl; Exs I and J.
14 Moreover, these press releases specified a number of factors which
15 might effect the projections, including the migration to "larger,
16 multi-year deals, which * * * may dampen near-term growth * * * and
17 add[] to the volatility of license revenues."  Id.

18       In addition to those warnings contained in the press
19 releases, both press releases referred investors to the Form 10-K
20 for additional warnings.  Gaw Decl; Ex C. at 31 ("These and other
21 factors are described in detail in our Annual Report on Form 10-K
22 for the fiscal year ended January 31, 2003 * * *.").  Thus, the
23 information in the Form 10-K was incorporated into the "total mix
24 of information in the document" available to reasonable investors,
25 even though the Form 10-K did not actually accompany the press
26 releases.  Copper Mountain, 311 F Supp 3d at 876 (citing Fecht v
27 The Price Co, 70 F3d 1078, 1082 (9th Cir 1995).  The Form 10-K
28 contained several pages of detailed and explicit warnings regarding

United States District Court

For the Northern District of California

Portal's dependance on a few large customers, the risks associated with long implementation periods, and the numerous variables which could adversely affect revenue recognition for any quarter.  Also, the Form 10-K warned that Portal would begin offering "products and services for a 'bundled' price, such that a separate price would not be identified for the product and service components.  Such a change <u>may significantly delay the timing of our revenue recognition</u>."  Gaw Decl; Ex C at 31 (emphasis added).  Because these warnings hew to the actual deficiencies that caused Portal's earnings shortfall -- "contract delays and revenue recognition deferrals" with existing large customers -- they provided sufficiently specific and material warnings to immunize defendants' forward-looking statements.  See <u>Copper Mountain</u>, 311 F Supp 2d at 882.

Plaintiffs also assert that, regardless of cautionary language, defendants are liable for their forward-looking statements because they knew them to be false and misleading when made.  Plaintiffs are correct that a forward-looking statement cannot be immunized under the PSLRA if it was made with "actual knowledge * * * that the statement was false or misleading."  15 USC 78u-5(c)(1)(B).  In this case, however, plaintiffs' argument is unavailing because plaintiffs have failed to demonstrate that the defendants knew that Portal would not achieve 10-12% growth or return to pro forma earnings within the year when the press releases were issued.  As discussed above, the TCAC is deficient, in part, in that it fails to allege facts showing how the alleged accounting adjustments materially affected the company's financial statements.  See supra IV(A)(1)(i).  These facts are necessary not

United States District Court

For the Northern District of California

1   only to plead adequately accounting fraud or scienter on the part

2   of defendants, but also to demonstrate that the defendants knew at

3   the time the earnings projections were announced that Portal could

4   not meet those projections.   Accordingly, Defendants' cannot be

5   liable for the forward-looking statements in the May 20 and August

6   19, 2005, press releases, and plaintiffs' claims premised on these

7   statements must be dismissed.

8

9                                   4

10                                20(a)

11                          *Control Liability*

12          Section 20(a) provides for "controlling person

13   liability."   To establish such liability, plaintiffs must first

14   demonstrate the existence of a violation under Section 10(b) -- the

15   "primary violation."   <u>Copper Mountain</u>, 311 F Supp 2d at 883

16   (citation omitted).   "[I]n the absence of a viable claim under

17   Section 10(b), any remaining Section 20(a) claims must be

18   dismissed."   Id (citations omitted).

19          Because the court has determined that plaintiffs have

20   failed to state claims under Section 10(b), plaintiffs have "no

21   basis upon which to premise a Section 20(b) claim" and the Section

22   20(b) claims must also be dismissed.

23

24                                   B

25      *Section 11, 12(a)(2) and 15 of the Securities Act of 1933*

26          Plaintiffs also bring claims against defendants for

27   violations of the '33 Act arising out of Portal's secondary public

28   offering in September 2003.   In contrast to claims brought under

                                    30

United States District Court

For the Northern District of California

the '34 Act, section 11 of the '33 Act creates a private remedy for a purchaser of a security where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading."  15 USC § 77k(a).  "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  In re Stac, 89 F3d at 1403-04.  "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions."  Id (citations omitted).  Before addressing the substance of the '33 Act claims, the court must first determine if they are time barred.

1

*Relation Back*

Defendants challenge the timeliness of plaintiffs' '33 Act claims.  Section 13 of the '33 Act requires that claims under sections 11 and 12(a)(2) be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 USC § 77m.  Plaintiffs' first complaint, filed on November 20, 2003, did not include '33 Act claims.  These claims were not added until the second amended complaint (SAC), filed on March 30, 2005 (sixteen months later).  Defendants argue that plaintiffs discovered the conduct giving rise to the '33 Act claims

31

United States District Court
For the Northern District of California

1   at least when the first complaint was filed.  Consequently,
2   defendants argue that the '33 Act claims are time-barred.

3   Plaintiffs seek to avoid this bar by asserting that the
4   new claims in the SAC "relate back" to the initial complaint under
5   FRCP 15(c)(2).  Rule 15(c)(2) states that an amended complaint
6   relates back to the initial one for statute of limitations purposes
7   if the "claim or defense asserted in the amended pleading arose out
8   of the conduct, transaction, or occurrence set forth * * * in the
9   original pleading."  The crux of this inquiry is "whether the
10  opposing party has been put on notice about the claim or defense
11  raised by the amended pleading."  <u>SEC v Seaboard Corporation</u>, 677
12  F2d 1301, 1314 (9th Cir 1982).  This court previously observed that
13  the class notice for the '34 Act claims would have put investors
14  with '33 Act claims on notice.  Doc #100. It follows that
15  defendants were also put on notice of the potential for '33 Act
16  claims arising from the same set of facts.

17

18                                  **2**

19                          *Sound in Fraud*

20  Section 11 does not contain an element of fraud, yet a
21  complaint may be subject to the particularity requirements of Rule
22  9(b) if it "sounds in fraud."  <u>Vess v Ciba-Geigy Corp USA</u>, 317 F3d
23  1097, 1103 (9th Cir 2003).  If the complaint alleges "a unified
24  course of fraudulent conduct and rel[ies] entirely on that course
25  of conduct as the basis of a claim * * * the claim is said to be
26  'grounded in fraud' or to 'sound in fraud,' and the pleading of
27  that claim as a whole must satisfy the particularity requirement of
28  Rule 9(b)."  Id at 1103-1104.

United States District Court
For the Northern District of California

1        In the TCAC, plaintiffs have made an artful attempt to

2   avoid this requirement by carefully compartmentalizing the counts

3   under the '33 Act and '34 Act.  Whereas the '34 Act claims allege

4   that defendants knowingly or recklessly engaged in a fraudulent

5   scheme to overstate revenues, for example, the '33 Act claims

6   merely allege that revenues were negligently overstated.  Yet the

7   Ninth Circuit has rejected this approach, finding that such

8   "nominal efforts are unconvincing where the gravamen of the

9   complaint is plainly fraud."  In re Stac, 89 F3d at 1405.

10       The court finds that plaintiffs' Section 11 claim clearly

11  "sounds in fraud."  Despite plaintiffs' pains to avoid Rule 9(b),

12  it is clear that the factual allegations upon which the entire

13  complaint rests allege knowing, reckless and willful conduct.  For

14  example, plaintiffs allege that defendants "negligently overstated

15  [revenue] due to the Defendants' manipulation of the purported

16  billing rates of Portal's employees."  TCAC ¶ 145(d).  Yet

17  plaintiffs' factual allegations supporting the manipulation of

18  billing rates unequivocally describes the conduct as intentional

19  and knowing.  Id ¶¶ 47, 48.  It strains credulity that plaintiffs

20  should allege that the overstatement of revenues was merely

21  "negligent" when it was a allegedly a direct result of defendants'

22  willful manipulation.  Plaintiffs cannot avoid the theory they

23  posit throughout the complaint:  that defendants fraudulently

24  schemed to inflate revenues.  Accordingly, the court finds that the

25  claims under the '33 Act sound in fraud, and therefore fail with

26  the '34 Act claims to meet the heightened pleading requirements of

27  the PSLRA and Rule 9(b).

28

**V**

*Conclusion*

For the reasons stated above, the court GRANTS defendants' motion to dismiss in its entirety.  Doc #115. Plaintiffs' TCAC is DISMISSED, but plaintiffs may file an amended complaint remedying the pleading deficiencies identified in this order and complying with the following instructions.

An amended complaint should specify those misstatements plaintiffs allege were false or misleading, including with regard to each statement: (1) the date made; (2) the speaker; (3) the content; (4) the falsity; (5) the basis for plaintiffs' allegation of falsity; and (6) scienter.  The amended complaint should also specify any omissions of fact that defendants were bound to disclose, including with respect to each omission:  (1) the date the information became known to the public; (2) the facts omitted; (3) the date the duty to disclose arose; (4) the basis for claiming that omitted information was known to defendants; (5) the basis for claiming that defendants had a duty to disclose; and (6) scienter. Finally, in light of <u>Dura</u>, plaintiffs should endeavor to tether all allegations in the complaint to the price movement of Portal's stock during the class period.  Any amended complaint must be filed within sixty (60) days of the date of this order.

IT IS SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge

**34**

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California