1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE PORTAL SOFTWARE, INC            No    C-03-5138 VRW
     SECURITIES LITIGATION.
12                                               ORDER
     _____/
13

14           Plaintiffs John Romeo and Pipefitters Local 522 & 633

15   Pension Trust Fund ("Pipefitters") sue under the Securities Act of

16   1933 (the "'33 Act") and the Securities Exchange Act of 1934 (the

17   "'34 Act") on behalf of investors who purchased securities of

18   Portal Software, Inc, between May 20, 2003, and November 13, 2003,

19   inclusive (the "class period").  Plaintiffs allege that defendants

20   Portal, John E Little, Howard A Bain III and Arthur C Patterson

21   violated generally accepted accounting principles (GAAP) by

22   artificially inflating the price of Portal's stock and making false

23   and misleading statements on which plaintiffs relied, thereby

24   incurring substantial financial losses from purchasing Portal stock

25   at fraudulently inflated prices.

26           On August 10, 2005, the court dismissed plaintiffs' third

27   consolidated amended complaint (TCAC (Doc #111)) because plaintiffs

28   did not plead with the particularity required by FRCP 9(b) and the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  Private Securities Litigation Reform Act (PSLRA), an amendment to

2  the '34 Act.  Doc #133 (Order) at 3.  The court also concluded that

3  plaintiffs' allegations did not support a strong inference of

4  scienter and that defendants' forward-looking statements were

5  protected by a safe harbor provision in the PSLRA.  Id.  Finally,

6  the court determined that plaintiffs' '33 Act claims sounded in

7  fraud and hence failed along with plaintiffs' '34 Act claims.  Id.

8  The court granted plaintiffs leave to amend to fix these pleading

9  deficiencies.  Id at 34.

10       After plaintiffs filed a fourth consolidated amended

11 complaint (Doc #135 (FCAC)), defendants moved to dismiss (Doc #138

12 (Mot Dis)), once again alleging that plaintiffs did not plead with

13 sufficient particularity to satisfy FRCP 9(b) and the PSLRA.  In

14 opposition, plaintiffs contend that their claims under sections 11,

15 12(a)(2) and 15 of the '33 Act do not sound in fraud and that the

16 FCAC states sufficiently particularized claims under sections 10(b)

17 and 20(a) of the '34 Act.  Doc #144 (Opp).

18       The court heard argument on these motions on March 23,

19 2006.  For the reasons discussed below, the court DENIES

20 defendants' motion to dismiss plaintiffs' claims under sections 11,

21 12(a)(2) and 15 of the '33 Act and GRANTS defendants' motion to

22 dismiss plaintiffs' claims under sections 10(b) and 20(a) of the

23 '34 Act.

24 //

25 //

26 //

27 //

28 //

**2**

United States District Court

For the Northern District of California

1

I

2    The factual and procedural history is derived from the

3  FCAC and is presumed to be true for purposes of this motion.

4  Gompper v VISX, Inc, 298 F3d 893, 895 (9th Cir 2002).  Portal

5  provides billing and subscriber management solutions to its clients

6  primarily through its "Infranet" software, for which Portal charges

7  companies "license fees."  FCAC ¶ 68.  Portal also charges

8  customers "service fees" for system implementation, consulting,

9  maintenance and training.  Id.  Following the "dot-com" market

10 crash of 2001, Portal lost many of its dot-com startup customers

11 and incurred financial losses that wiped out more than 96% of its

12 equity.  Id ¶ 69.

13    Portal subsequently began to market its Infranet product

14 to more established and sophisticated business customers, including

15 telecommunications providers.  Id.  Portal's new clients required

16 greater software customization than had the dot-com startups, which

17 in turn affected how Portal could recognize license fee revenues.

18 Id.  Plaintiffs contend that under GAAP, a software provider cannot

19 recognize licensing revenues for software that requires

20 customization for a client until a substantial portion of the

21 modification has been completed.  Id ¶¶ 4, 44(e), 69.  Although

22 Portal historically could recognize revenue when it delivered its

23 Infranet product to its dot-com clients, the greater customization

24 required by Portal's new, more established clients required the

25 company to defer recognizing revenue from many of its contracts

26 until customization was complete.  Id ¶ 153.  Plaintiffs allege

27 that during the class period, Portal began to manipulate its

28 license fees to recognize more revenue "up-front."  Id ¶¶ 70-71.

3

**United States District Court**
For the Northern District of California

On September 12, 2003, Portal completed a secondary offering to the public at a price of $13.25 per share, thereby generating $60 million in net proceeds.  Id ¶ 9.  On November 13, 2003, defendants announced that due to contract delays, revenue recognition deferrals and service execution issues, Portal expected net losses of $0.36 to $0.40 per share for the third quarter of fiscal year (FY) 2004.  Id ¶ 10.  These losses contrasted with the $0.04 net profits per share that Portal had previously projected for the quarter.  Id.  After this announcement, Portal's common share price plummeted more than 42.5% to $8.77 in after-hours trading.  Id ¶ 113.  Plaintiffs allege, "Defendants' inaccurate statements and omissions proximately caused damages to Plaintiffs and other members of the Class who purchased the Company's shares at artificially inflated prices, and suffered loss * * * as the truth began to be publicly revealed about the Company's previously undisclosed adverse business and financial condition," causing share prices to fall.  Id ¶ 13.

//
//
//
//
//
//
//
//
//
//
//

4

II

Plaintiffs brought claims under sections 11, 12(a)(2) and 15 of the '33 Act, alleging that Portal made negligent overstatements in connection with its September 12, 2003, secondary public offering. Id ¶¶ 16-64. The court examines in turn defendants' motion to dismiss these claims.

A

As with the claims in the TCAC, defendants contend plaintiffs' instant section 11 claim does not satisfy the particularity requirement of FRCP 9(b). Mot Dis at 17-19. According to defendants, FRCP 9(b) applies here because "the core allegations underpinning plaintiffs' '34 Act [section 10] and '33 Act [sections 11 and 12] claims remain the same" as in the TCAC. Id at 3.

FRCP 9(b) only applies to allegations sounding in fraud or mistake; a section 11 claim based on a negligent or innocent misstatement or omission does not require particularized pleading. See In re Stac Electronics Securities Litigation, 89 F3d 1399, 1405 n3 (9th Cir 1996). As described below, plaintiffs' present section 11 claim sounds in negligence not in fraud; hence, the claim need not meet FRCP 9(b)'s heightened pleading standard.

Plaintiffs explicitly state that their section 11 claim "does not contain any allegations sounding in fraud * * * [and that plaintiffs] do not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent." FCAC ¶ 32. This disclaimer is borne out by the factual allegations supporting plaintiffs' instant section 11

United States District Court

For the Northern District of California

claim, which unlike its predecessor in the TCAC, does not allege that defendants committed fraud or recklessly and deliberately made false or misleading statements to the investing public.  Compare TCAC ¶¶ 40-153 with FCAC ¶¶ 16-52.  Plaintiffs no longer allege that defendants actively concealed material information, compare TCAC ¶ 19 with FCAC ¶ 31, or participated in a fraudulent scheme.  And rather than allege that Portal's license revenues "were materially overstated due to Defendants' artificial manipulation" (TCAC ¶ 64(a)), plaintiffs now allege that these same license revenues were "negligently overstated" (FCAC ¶ 44(e)).  Accordingly, plaintiffs have successfully amended their section 11 claim such that it does not sound in fraud.

         Moreover, plaintiffs' allegations of fraud in their section 10 claim have no impact on their section 11 claim.  FRCP 8(e)(2) permits plaintiffs to "set forth two or more statements of a claim * * * alternately or hypothetically, either in one count * * * or in separate counts."  Hence, contrary to defendants' contention, plaintiffs can allege that defendants committed fraud for purposes of the section 10 claim while relying on a negligence theory for the section 11 claim.

         Defendants further suggest that plaintiffs have not even met the more lenient pleading standard of FRCP 8.  Mot Dis at 19 n11.  But FRCP 8(a) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," which plaintiffs have provided.  Section 11 creates a private remedy for a purchaser of a security if "any part of the registration statement * * * contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or

United States District Court

For the Northern District of California

necessary to make the statement therein not misleading."  15 USC § 77k(a).  Paragraphs 35 through 43 of the FCAC highlight specific statements defendants made in Portal's registration statement and paragraph 44 alleges facts indicating that these statements were inaccurate.

Defendants also allege that plaintiffs' section 11 claim fails "to plead the requisite loss causation element."  Mot Dis at 3.  But defendants' argument belies the plain language of that provision:  "[I]f the <u>defendant proves</u> that any portion or all of such damages represents other than the depreciation in value * * * resulting from such part of the registration statement, with respect to which his liability is asserted, * * * such portion of or all such damages shall not be recoverable."  15 USC § 77k(e) (emphasis added).  Accordingly, the statute provides that loss causation is an affirmative defense on which "[t]he defendant has the burden of proof * * *."  <u>In re Worlds of Wonder Securities Litigation</u>, 35 F3d 1407, 1422 (9th Cir 1994).  And because the complaint on its face does not foreclose the possibility that defendants caused plaintiffs' losses, a failure to plead loss causation cannot sink plaintiffs' claims on the present motion to dismiss.  Contrast <u>In re DNAP Securities Litigation</u>, 2000 WL 1358619, at *3 (ND Cal 2000) ("Although loss causation is an affirmative defense, * * * in this case it is evident on the face of the complaint [that loss causation cannot be established] and thus may be raised on a motion to dismiss * * *.").

Accordingly, the court DENIES defendants' motion to dismiss plaintiffs' section 11 claim.

**United States District Court**
For the Northern District of California

B

Turning to plaintiffs' claim under section 12(a)(2), that provision "imposes civil liability on a person who offers or sells securities by means of a prospectus or oral communication containing material misrepresentations or omissions." <u>Moore v Kayport Package Express, Inc</u>, 885 F2d 531, 535 (9th Cir 1989); 15 USC § 77*l*(a)(2).  Plaintiffs must allege facts indicating that defendants actually sold or otherwise solicited the purchase of the securities at issue here and hence were "sellers" within the meaning of section 12.  See id at 535-36 (noting that the section 12(a)(1) analysis of "seller" in <u>Pinter v Dahl</u>, 486 US 622, 639-53 (1988), applies to section 12(a)(2)).

Plaintiffs have alleged the individual defendants were "sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the Prospectus."  FCAC ¶ 55.  A mere assertion that defendants are solicitors or sellers is a legal conclusion and therefore insufficient to withstand a motion to dismiss.  See, e g, <u>Shaw v Digital Equipment Corp</u>, 82 F3d 1194, 1216 (1st Cir 1996) (superceded in part by PSLRA); <u>In re Westinghouse Securities Litigation</u>, 90 F3d 696, 717 (3d Cir 1996) (Alito, J).  But here, plaintiffs have pled sufficient facts to demonstrate defendants' seller status for purposes of the present motion.  For example, plaintiffs allege defendants issued "materially false and misleading written statements to the investing public" and defendants' solicitation activity "included participating in, and signing, the preparation of the false and misleading Prospectus." FCAC ¶¶ 49, 56.  Moreover, the court agrees "whether an individual is a seller under section 12 is a question of fact, not properly

8

United States District Court

For the Northern District of California

1  decided on a motion to dismiss." <u>In re Stratosphere Corp</u>

2  <u>Securities Litigation</u>, 1 F Supp 2d 1096 (D Nev 1998).  Hence,

3  plaintiffs' allegations of defendants' seller status are adequate

4  to survive the present motion.

5        Defendants also attack the section 12(a)(2) claim by

6  arguing, as they did with the section 11 claim, that plaintiffs

7  failed adequately to allege fraud and causation.  But "fraud is not

8  a necessary element of a claim under section 12[a](2) * * *." <u>In</u>

9  <u>re Westinghouse</u>, 90 F3d at 717.  Because the section 12(a)(2) claim

10  alleges the same facts as the section 11 claim and specifically

11  disclaims any allegation of fraud or intentional or reckless

12  misconduct, FCAC ¶¶ 53-60, the section 12(a)(2) claim need not meet

13  any heightened pleading standards and satisfies FRCP 8's

14  requirements.  Moreover, as with the section 11 claim, "[c]ausation

15  * * * is not a necessary element of a prima facie case under

16  section 12 of the Securities Act." <u>In re Daou Systems, Inc,</u>

17  <u>Securities Litigation</u>, 411 F3d 1006, 1029 (9th Cir 2005).  Hence,

18  any failure to plead "loss causation" is not fatal to the section

19  12(a)(2) claim.

20        Accordingly, the court DENIES defendants' motion to

21  dismiss plaintiffs' section 12(a)(2) claim.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**United States District Court**

For the Northern District of California

**C**

Turning to plaintiffs' section 15 claim, defendants contend that "controlling person" liability under that section is conditioned on liability under either sections 11 or 12.  Mot Dis at 20 n12; 15 USC § 77o.  Because the court has determined that plaintiffs' claims under sections 11 and 12 are sufficient to survive the instant motion to dismiss, this argument is moot.

Defendants also object in passing to the section 15 claim against individual defendant Patterson, arguing plaintiffs have not pled sufficient facts to indicate that Patterson was a "controlling person."  Mot Dis at 20 n12.  Plaintiffs have alleged that Patterson was a director of Portal and that his signature appears on the registration statement at issue.  FCAC ¶¶ 23, 34.  While a director is not liable merely by virtue of his position, "[i]t is not uncommon for control 'to rest with a group of persons, such as the members of the corporation's management.'"  Arthur Children's Trust v Keim, 994 F2d 1390, 1396 (9th Cir 1993) (quoting 4 Loss & Seligman, *Securities Regulation* 1722 (1990)).  In any event, determining whether Patterson is a controlling person is a highly factual question that should not be decided on the instant motion to dismiss.  Compare id ("[T]he determination of who is a controlling person for purposes of liability under [a different securities provision, 15 USC § 78t,] is an intensely factual question.").

Accordingly, the court DENIES defendants' motion to dismiss plaintiffs' section 15 claim.

//

//

10

United States District Court

For the Northern District of California

III

Plaintiffs also assert claims under sections 10(b) and 20(a) of the '34 Act, contending that Portal prematurely recognized revenue in violation of GAAP.  Plaintiffs contend that Portal disseminated false and misleading statements to the investing public, both during and after the class period, via SEC filings and press releases.  FCAC ¶¶ 90-197.  To support these allegations, plaintiffs rely in part on information from five unnamed former Portal employees: (1) a controller; (2) a senior business analyst; (3) an accounts receivable and revenue assurance assistant; (4) a senior marketing manager and (5) a vice-president of services.  Id ¶¶ 69-85, 99, 124, 150-162.

The court now examines in turn defendants' motion to dismiss plaintiffs' claims under sections 10(b) and 20(a).

A

Section 10(b) of the '34 Act and SEC Rule 10b-5, promulgated thereunder, make it unlawful for any person, in connection with the purchase or sale of any security, (1) to engage in fraud, (2) to make an untrue statement regarding a material fact or (3) to make a misleading statement by omitting a material fact. 15 USC § 78j(b); 17 CFR § 240.10b-5.  Consequently, the elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation and (5) economic loss.  See Dura Pharmaceuticals, Inc v Broudo, 125 SCt 1627, 1631 (2005).

//

11

United States District Court

For the Northern District of California

Claims brought under section 10(b) and Rule 10b-5 must first meet the particularity requirements of FRCP 9(b).  In re Stac, 89 F3d at 1404.  FRCP 9(b) requires a plaintiff alleging fraud to "set forth what is false or misleading about [the] statement, and why it is false."  In re GlenFed, Inc, Securities Litigation, 42 F3d 1541, 1548 (9th Cir 1994) (superceded by the PSLRA on other grounds).

Second, a complaint must satisfy the more stringent requirements imposed on securities fraud pleadings by the PSLRA. Specifically, the PSLRA requires that a complaint: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" (15 USC § 78u-4(b)(1)); (2) for any such allegations based on information and belief, "state with particularity all facts on which that belief is formed" (15 USC § 78u-4(b)(1)) and (3) "with respect to each act or omission * * * state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 USC § 17u-4(b)(2)).  The required state of mind, or scienter, is met when the complaint alleges "that the defendants made the false or misleading statements either intentionally or with deliberate recklessness."  In re Daou, 411 F3d at 1015 (citing In re Silicon Graphics, Inc, Securities Litigation, 183 F3d 970, 974 (9th Cir 1999)).  In securities cases, falsity and scienter "are generally strongly inferred from the same set of facts and the two requirements may be combined into a unitary inquiry under the PSLRA."  In re Vantive Corp, Securities Litigation, 283 F3d 1079, 1091 (9th Cir 2002) (internal citations omitted).

//

United States District Court

For the Northern District of California

To demonstrate falsity and scienter, plaintiffs rely on testimony from several confidential witnesses, all former Portal employees.  Confidential sources can be used to satisfy the PSLRA's heightened pleading requirements only if the complaint describes the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Nursing Home Pension Fund, Local 144 v Oracle Corp, 380 F3d 1226, 1233 (9th Cir 2004) (quoting Novak v Kasaks, 216 F3d 300, 314 (2d Cir 2000)).  The unnamed sources must provide information that is adequately corroborated by other facts.  In re Silicon Graphics, 183 F3d at 985.

The Ninth Circuit has recently adopted the First Circuit's "suggested criteria for assessing reliability of confidential witnesses."  In re Daou, 411 F3d at 1015.  These criteria include "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  In re Cabletron Sys, Inc, 311 F3d 11, 29-30 (1st Cir 2002).  Moreover, when a complaint relies on unnamed employees, courts generally look for specific descriptions of the employee's relevant duties and responsibilities to evaluate the reliability of their information.  See, e g, In re Daou, 411 F3d at 1016 (finding that confidential witnesses were described with a "large degree of specificity" where the complaint provided the witnesses' job descriptions and responsibilities and identified for some of the witnesses the executive to whom the witness reported); see also In re Northpoint Communications Group, Inc,

United States District Court

For the Northern District of California

<u>Securities Litigation</u>, 221 F Supp 2d 1090, 1097 (ND Cal 2002)
(holding that a second amended complaint cured some specificity
problems of the original complaint where it set out, in addition to
job titles and tenures of confidential witnesses, their
responsibilities at the company).

        The PSLRA also carves out a safe harbor from liability if
the allegedly false or misleading statements were forward-looking
and accompanied by meaningful "cautionary statements."  15 USC §
78u-5©); see also <u>In re Splash Technology Holdings, Inc Securities
Litigation</u>, 2000 WL 1727377, at *5 (ND Cal 2000).  An analogous
doctrine that predates the PSLRA's enactment is the "bespeaks
caution" doctrine, which allows a court to rule as a matter of law
that defendant's forward-looking statements contained enough
cautionary language or risk disclosure to protect against
liability.  See, e g, <u>Provenz v Miller</u>, 102 F3d 1478, 1493 (9th Cir
1996).  If a defendant's statements are immunized under either
doctrine, dismissal of the complaint is appropriate.  See id; <u>In re
Splash</u>, 2000 WL 1727377, at *5-6.


                                B

        Plaintiffs contend that on four separate occasions
defendants made a total of seventeen false statements, each of
which allegedly supports their claims under sections 10(b) and
20(a).  These statements include:  (1) two false statements in a
May 20, 2003, press release; (2) seven false statements in a June
16, 2003, form 10-Q filing with the SEC for the first quarter of FY
2004 (1Q04); (3) one false statement in an August 19, 2003, press
release and (4) seven false statements in a September 12, 2003,

                               14

form 10-Q filing with the SEC for the second quarter of FY 2004 (2Q04).

1

*May 20, 2003, and August 19, 2003, press releases*

Plaintiffs allege that on May 20, 2003, Portal issued a press release falsely reporting that Portal's revenue for the first quarter of FY 2004 was $32.1 million, with a net loss of $2.0 million.  FCAC ¶ 90.  Portal issued the press release under the headline, "Third Consecutive Quarter of Revenue and Business Growth."  Id.  Plaintiffs contend that the May 20 press release included a false statement from defendant Little, who said, "[Portal is] the only company in [its] market reporting increasing revenues and quarter-to-quarter product license growth."  Id.  Plaintiffs also assert that the May 20 press release falsely stated that Portal expected 10-12% growth, a "return to pro forma profitability" and "positive cash flow operations within the current fiscal year."  Id ¶ 91.

On August 19, 2003, Portal issued another press release, which plaintiffs contend falsely reported that Portal's revenue for the second quarter of FY 2004 was $33.2 million, with a net loss of $2.5 million.  Id ¶ 101.  Portal issued this press release under the headline, "Fourth Consecutive Quarter of Revenue and Business Growth."  Id.

Plaintiffs rely on substantially the same allegations in contending that the two press releases included false statements and that defendants acted with scienter in making these statements. Accordingly, the court considers the statements in these press

United States District Court

For the Northern District of California

15

releases together in determining whether plaintiffs' allegations satisfy the PSLRA's pleading requirements for falsity and scienter.

a

In contending that the press releases include false statements that defendants made with scienter, plaintiffs rely on the testimony of a former controller employed by Portal from April 1997 to June 2002.  Id ¶ 69.  The controller alleges that during the class period (May 20, 2003, to November 13, 2003, inclusive), Portal prematurely recognized license revenues prior to delivering software to customers.  Id ¶¶ 71, 99(a).

Plaintiffs' TCAC included substantially the same testimony from the former controller.  TCAC ¶ 43.  In dismissing that complaint, the court found that the controller lacked inherent indicia of reliability because his employment with Portal terminated before the class period even began.  Order at 19. Moreover, the controller's testimony was especially unreliable because his entire account of the allegedly fraudulent activity during the class period was based on second-hand reports from unnamed Portal insiders.  TCAC ¶ 43.

The only change in the FCAC as compared to the TCAC is that the controller now expresses "confidence" in his sources' "accuracy" and believes they are "in a position to know [Portal's accounting practices]."  FCAC ¶ 71.  But the controller does not provide the particularized detail necessary to convince the court that his sources are reliable.  Because the controller is a confidential source who relies on other confidential sources for his information, the controller's "allegations attributed to

16

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge."  See <u>In re Northpoint</u>, 221 F Supp 2d at 1097.  And as previously explained, "plaintiffs must describe the job title, job description, duties, and dates of employment for the <u>controller's sources</u> before this information can be deemed reliable."  Order at 19.  Plaintiffs' failure to provide this information in the FCAC renders the controller's testimony unreliable.

b

Plaintiffs also rely on the testimony of a former senior business analyst employed by Portal from May 2001 through July 2003.  FCAC ¶ 72.  Plaintiffs contend Portal could not legitimately recognize revenue for partial performance on certain contracts before demonstrating vendor specific objective evidence (VSOE).  According to the witness, defendant Bain personally instructed him to fabricate studies demonstrating the necessary VSOE, so that the results for financial analyses of six contracts were prematurely recognized, I e, "cooked."  Id ¶¶ 75-76.  The senior business analyst identifies one customer by name for whom he created false revenue recognition studies ("Columbia [sic] Mobile"), states that he was "required to perform analyses that matched management's predetermined results for work performed in * * * Greece, Italy, Columbia [sic] and Spain in connection with at least six of Portal's major contracts" and opines that Portal booked $5.0 million in revenue from these contracts.  Id ¶¶ 76, 162.
//

17

United States District Court

For the Northern District of California

Based on his personal involvement in fraudulent activity at the behest of Bain, the court concludes, as it did when evaluating the TCAC, that the senior business analyst's allegations potentially support a claim under the '34 Act.  Moreover, the court finds the specificity of the analyst's account provides a certain degree of reliability.

Nonetheless, as with the TCAC, the analyst's testimony again fails to indicate how the alleged manipulations affected the public statements made by Portal.  "[T]he plaintiff must show with particularity how the [improper revenue] adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position."  In re Daou, 411 F3d at 1018.  Here, such particularity is lacking.  For example, while the analyst asserts that on "six to ten" contracts worth "approximately $5 million" he "prepared falsified employee billing rates," neither the analyst nor plaintiffs state how much of this $5 million was improperly recognized.  The FCAC does not even state whether the allegedly manipulated billing rates led to any increase in recognized revenue.  Accordingly, the confidential business analyst's testimony is insufficient to demonstrate falsity and scienter under the pleading requirements of the PSLRA.

c

Plaintiffs also rely on the testimony of an accounts receivable and revenue assurance assistant employed by Portal "until early 2004."  FCAC ¶ 77.  This witness was "responsible for billing, contract review, and reconciling accounts receivable with the general ledger" and apparently has at least twelve years

experience working with revenue recognition.  Id.  The witness asserts Portal engaged in improper, accelerated recognition of revenue, identifying one customer by name ("Onstar").  Id.  As with the TCAC, the court is satisfied that the unnamed witness's account in the FCAC self-identifies the witness's duties and basis for knowledge and bears sufficient indicia of reliability.

Nonetheless, in its previous order dismissing the TCAC, the court discounted this witness's testimony because, "[a]lthough the accounts receivable assistant allegedly reclassified improperly booked revenues, [he did] not indicate how much revenue was reclassified or how this affected Portal's financial statements." Order at 22.  Plaintiffs have not remedied this lack of particularity in the FCAC.  See In re Daou, 411 F3d at 1018. Accordingly, the court again finds this witness's testimony to be insufficiently particularized to support a claim under section 10(b).

d

Plaintiffs also rely on the testimony of a former vice-president of services, who was employed throughout the class period.  FCAC ¶ 79.  The former vice-president describes three instances of allegedly fraudulent activity.

First, the vice-president asserts (as paraphrased by plaintiffs) that "Portal had represented that revenues associated with Portal's work for Vodaphone Japan was [sic] 'in the bucket' when, in fact, the 'contract was no where [sic] close to being signed.'"  Id ¶ 79.  The vice-president began working directly on the Vodaphone Japan contract near the start of the class period and

apparently reported early on to Portal's senior management that several contract issues could not be resolved by the end of FY 2004.  Id ¶ 80.  Plaintiffs assert that "Portal nonetheless recognized revenue associated with this unsigned contract."  Id ¶ 80.

This testimony is insufficient to satisfy the PSLRA's pleading requirements.  Plaintiffs have not identified any particular revenue that was associated with the Vodaphone Japan contract and was improperly recognized during the class period. Hence, plaintiffs have not tied the alleged fraud to the purportedly false public statements made by Portal.

Next, the former vice-president asserts that Portal "pretended" that $2.0 million in revenue for a contract with Enabil Solutions would be recordable in the third quarter of FY 2004, even though required milestones had not been met.  Id ¶ 81.  Defendants apparently acknowledged this information at an October 2003 meeting attended by the witness.  Id ¶ 81.

This testimony also is insufficient.  As a preliminary matter, neither plaintiffs nor the vice-president have explained precisely what is meant by "pretending" that certain revenue would be recordable at a given time.  More importantly, the vice-president only learned about the alleged fraud on Enabil Solutions at an October 2003 meeting, which occurred <u>after</u> Portal had made its allegedly false statements in its press releases and 10-Q filings with the SEC.  Hence, the vice-president's testimony has no bearing on whether defendants acted with scienter when those statements were made.

//

United States District Court

For the Northern District of California

Finally, the former vice-president states that Portal sold software with "product problems" to Colombia Mobile, necessitating further expenditures by Portal to "fix the problem." Id ¶ 87.  This witness therefore asserts that Portal's revenue projections were "pipe dreams" and "unrealistic."  Id ¶ 88.

As with the Vodaphone Japan contract, the FCAC does not indicate how these alleged problems with Colombia Mobile affected Portal's financial earnings statements.  And the former vice-president's seemingly off-the-cuff remarks that Portal's revenue projections were "pipe dreams" and "unrealistic" are not sufficiently particularized to support a claim of fraud under section 10(b).

Accordingly, because the facts provided by the former vice-president are not tied to any particular allegedly fraudulent statement, these facts are insufficient to meet the heightened pleading requirements of the PSLRA.

e

Plaintiffs also contend Portal's form 10-Q for the third quarter of FY 2004 presented a "percentage-of-completion" accounting method that "differed" from the previous quarter. Instead of calculating percentage-of-completion based on hours, plaintiffs allege the statement indicates Portal began calculating whether a project was complete based on costs.  Id ¶¶ 121-22.  But again, plaintiffs do not tie this information to any particular allegedly false statement.  And plaintiffs never "link the decline in share price to any purported improper revenue recognition."  In re Daou, 411 F3d at 1026.  Rather, plaintiffs appear to mention

21

1   these points merely to create an aura of fraud, which is an

2   unfortunate technique that plagues plaintiffs' entire FCAC.  The

3   PSLRA mandates greater particularity than what plaintiffs have

4   provided here.

5

6                              f

7         As noted above, defendants' May 20, 2003, press release

8   claimed that Portal expected 10-12% growth, a "return to pro forma

9   profitability" and "positive cash flow operations within the

10  current fiscal year."  Id ¶ 91.  Contending that these predictions

11  were fraudulent, plaintiffs proffer the testimony of a senior

12  marketing manager, employed by Portal during the first two months

13  of the class period.  Id ¶ 83.  The marketing manager states that

14  portions of Portal's billing software were being rendered obsolete

15  by Customer Relationship Management (CRM) applications sold by

16  vendors like SAP and Siebel.  Id.  Moreover, Portal's Infranet

17  product was having difficulty interfacing with these CRM

18  applications, resulting in unexpected costs and delays for Portal.

19  Id ¶ 86.  Plaintiffs allege that the allegedly false statements

20  belied the true state of Portal's financial health, including these

21  technical difficulties and the declining demand for Portal's

22  product during the class period.

23        As a "senior marketing manager," this employee plausibly

24  has knowledge of the market for Portal's product and could

25  conceivably provide evidence of the "shrinking market and role for

26  billing software applications."  Id ¶ 84.  In addition, the

27  employee identifies two vendors, SAP and Siebel, that offered

28  products that "displaced the role previously provided" by aspects

United States District Court

For the Northern District of California

of Portal's billing software.  Id ¶ 83.

        But that is all this witness provides.  The employee fails to identify any of "Portal's large telecommunications customers," id, for whom customer service applications were no longer required as part of Portal's billing software.  And although the marketing manager alleges Portal was spending too much time and money due to "excessive bugs and/or interface problems with other applications," id ¶ 86, these allegations fail to identify any specific problems, customers, contracts or dates.  "Without any corroborating facts, it is impossible to conclude that such allegations rest on more than hind-sight speculation."  <u>In re Vantive</u>, 283 F3d at 1089.

        Moreover, the statements challenged here concern "future economic performance" and "projection[s] of revenues" and therefore were forward-looking statements under the PSLRA.  15 USC § 78u-5(I); <u>In re Copper Mountain Securities Litigation</u>, 311 F Supp 2d 857, 880 (ND Cal 2004).  As described below, these forward-looking statements were accompanied by cautionary language that was sufficiently specific and meaningful to warn investors of the risks that actually materialized.

        First, defendants' May 20 and August 19 press releases each included "safe harbor" warnings regarding forward-looking statements and noted that their predictions were subject to uncertainties and risk.  Doc #106, Exs H, I.  These press releases specified a number of factors that could affect the projections, including the migration to "larger, multi-year deals, which * * * may dampen near-term growth * * * and add[] to the volatility of license revenues," (id, Ex H) and the possibility that Portal's

United States District Court

For the Northern District of California

1  "customers will continue to constrain their capital spending due to

2  their on-going soft market outlook for an extended period of time,"

3  (id, Ex I).

4          In addition to those warnings, the press releases

5  referred investors to a form 10-K for additional warnings.  Doc

6  #106, Exs H, I ("These and other factors are described in detail in

7  our Annual Report on Form 10-K for the fiscal year ended January

8  31, 2003 * * *.").  Hence, the information in the form 10-K was

9  incorporated into the "total mix of information in the document"

10  available to reasonable investors, even though the form 10-K did

11  not actually accompany the press releases.  In re Copper Mountain,

12  311 F Supp 2d at 876 (citing Fecht v The Price Co, 70 F3d 1078,

13  1082 (9th Cir 1995)).  The form 10-K contained several pages of

14  detailed and explicit warnings regarding Portal's dependence on a

15  few large customers, the risks associated with long implementation

16  periods and the numerous variables that could adversely affect

17  revenue recognition for any quarter.  Doc #106, Ex C.  Also, the

18  form 10-K warned that Portal would begin offering "products and

19  services for a 'bundled' price, such that a separate price would

20  not be identified for the product and service components.  Such a

21  change may significantly delay the timing of our revenue

22  recognition."  Id at 33.  Because these warnings hew to the actual

23  deficiencies that caused Portal's earnings shortfall —— "contract

24  delays and revenue recognition deferrals" with existing large

25  customers —— they provided sufficiently specific and material

26  warnings to immunize defendants' forward-looking statements.  See

27  In re Copper Mountain, 311 F Supp 2d at 882.

28  //

United States District Court

For the Northern District of California

Plaintiffs nonetheless assert defendants are liable for their forward-looking statements because they knew the statements were false and misleading when made.  FCAC ¶ 193.  This argument, however, ignores that the relevant statutory language provides that a person generally shall not be liable for a forward-looking statement "identified [as such and] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or * * * the plaintiff fails to prove that the forward-looking statement[,] * * * if made by a business entity;[,] was * * * false or misleading."  15 USC § 78u-5(c) (emphasis added).  Because the statute is disjunctively phrased, "if a statement is accompanied by meaningful cautionary language, the defendants' state of mind is irrelevant."  Harris v Ivax Corp, 182 F3d 799, 803 (11th Cir 1999) (internal punctuation omitted); see also In re SeeBeyond Technologies Corp Securities Litigation, 266 F Supp 2d 1150, 1163-67 (CD Cal 2003) (plain statutory language is disjunctive).  Accordingly, because the forward looking statements at issue were accompanied by meaningful cautionary language, these forward-looking statements are within the statutory safe harbor.

CONCLUSION

Plaintiffs have strenuously argued that the court should apply a so-called "totality" standard in assessing their section 10(b) claims.  See Oracle, 380 F3d at 1230 (court must consider "the total of plaintiffs' allegations" in assessing claims of scienter) (quoting No 84 Employer-Teamster Joint Council Pension

United States District Court

For the Northern District of California

*Trust Fund v America West Holding Corp*, 320 F3d 920, 938 (9th Cir 2003)).  But as discussed above, plaintiffs have not set forth any allegations that are sufficiently particularized to demonstrate the May 20, 2003, and August 19, 2003, press releases contained materially false statements or to raise a strong inference that defendants acted with scienter when making those statements. Accordingly, even if plaintiffs' allegations are taken collectively, plaintiffs have failed to state a claim under section 10(b) and Rule 10b-5 regarding statements in the press releases.

**2**

*June 16, 2003, and September 12, 2003, form 10-Q reports*

Plaintiffs also allege that Portal's form 10-Q quarterly reports filed during the class period contained materially false statements that support plaintiffs' section 10 claims.  On or about June 16, 2003, Portal filed with the SEC its form 10-Q quarterly report for the period ended May 2, 2003 (the "1Q 2004 10-Q").  FCAC ¶ 93.  On or about September 12, 2003, Portal filed with the SEC its form 10-Q quarterly report for the period ended August 1, 2003 (the "2Q 2004 10-Q").  Id ¶ 104.  The court now examines the allegations that plaintiffs contend demonstrate that the form 10-Q filings contained false information and that defendants acted with scienter.

//

//

//

//

//

**United States District Court**

For the Northern District of California

a

As a preliminary matter, the court notes the 1Q 2004 10-Q and the 2Q 2004 10-Q apparently repeated the same allegedly false financial information that was provided in the May 20, 2003, and August 19, 2003, press releases, respectively. Id ¶¶ 93, 104. As discussed in section III(B)(1), *supra*, plaintiffs did not provide sufficiently particularized allegations to demonstrate falsity and scienter regarding the statements in the press releases. Hence, these same allegations are also insufficient to demonstrate falsity and scienter for corresponding statements in the form 10-Q reports.

b

Plaintiffs allege that Portal's 1Q 2004 10-Q and 2Q 2004 10-Q falsely stated that, pursuant to SOP 97-2, "Portal uses the residual method to recognize revenue when a license agreement includes one or more elements to be delivered at a future date and vendor specific objective evidence of the fair value ('VSOE') of all undelivered elements exists." Id ¶¶ 94, 105.

Beginning with Portal's 1Q 2004 10-Q, plaintiffs rely on the same former senior business analyst's testimony that the court already addressed in connection with defendants' press releases. See *supra* III(B)(1)(b); FCAC ¶¶ 72-76. Because the court already found this witness's account to be unreliable and plaintiffs point to no other specific allegations of falsity and scienter, this fraud claim fails.

//

//

//

United States District Court

For the Northern District of California

1    Turning to Portal's 2Q 2004 10-Q, plaintiffs point to a
2  conversation that defendants Bain and Little conducted with
3  financial analysts during a November 13, 2003, conference call,
4  which occurred on the same day that Portal's 3Q04 financial results
5  were announced and the class period ended.  Id ¶¶ 112, 136.  In
6  that conference, Little stated that while service revenue could
7  generally be recognized on an "ongoing basis," revenue on license
8  contracts "may not be recognizable" until customer acceptance is
9  secured.  Id ¶ 136.  When questioned further whether licence
10 contract revenue was accounted for based on milestones or project
11 completion, Little stated that "[d]ifferent projects are done in
12 different ways."  Id.

13    Plaintiffs fail to explain how Little's statements in the
14 conference call demonstrate that Portal's 2Q 2004 10-Q contained
15 false information or that defendants acted with scienter when
16 submitting the 2Q 2004 10-Q.  There is no necessary inconsistency
17 between Portal's description of its "residual method" of accounting
18 in the 2Q 2004 10-Q and Little's subsequent statement that some
19 license revenue "may" not be recognizable until Portal had secured
20 customer acceptance.  For example, the allegedly false statements
21 in the 2Q 2004 10-Q apply only to license agreements that include
22 (1) "one or more elements to be delivered at a future date" and (2)
23 VSOE "of all undelivered elements."  But neither of these aspects
24 of license revenue recognition was mentioned during the phone
25 conference relied on by plaintiffs, suggesting that Little might
26 have been referring to other types of license agreements.
27 Accordingly, plaintiffs have not sufficiently pled a section 10(b)
28 claim for this allegedly false statement.

c

Plaintiffs also allege that Portal's 1Q 2004 10-Q contained the following false statement: "If a services agreement includes milestones, Portal does not recognize revenue until customer acceptance has occurred." Id ¶ 95. Plaintiffs allege that Portal's 2Q 2004 10-Q contained essentially the same false statement: "If a services agreement includes milestones, Portal does not recognize revenue until customer acceptance of the milestone has occurred." Id ¶ 106. Plaintiffs contend that in reality, Portal would recognize revenue prior to customer acceptance of milestones.

To demonstrate falsity and scienter, plaintiffs rely on the testimony of the former vice-president of services. The court has already rejected this testimony, see *supra* III(B)(1)(d), which is not sufficiently particularized or tethered to an allegedly false statement.

Plaintiffs also rely on Portal's fiscal 2004 form 10-K, filed April 14, 2004, which stated that revenue reporting for the fourth quarter of FY 2004 (and therefore, the net revenue reported for FY 2004) would exclude previously reported revenue of $700,000. FCAC ¶ 126. Apparently this exclusion of revenue was due to a customer's failure to accept contractual milestones. Id. But these allegations speak to Portal's activities after the class period had ended on November 13, 2003. A public filing by defendants indicating that revenue would be restated for a period after the class period had ended neither demonstrates that revenue statements made by defendants during the class period were false nor raises a strong inference that defendants acted with scienter

United States District Court

For the Northern District of California

1  when making those statements.  Accordingly, these kinds of

2  allegations do not bear on the allegedly false statements at issue

3  here.

4

5                                 d

6         Plaintiffs further contend that Portal's 1Q 2004 10-Q

7  falsely stated that "both the license revenues and services

8  revenues are recognized under the percentage-of-completion contract

9  method in accordance with the provisions of SOP 81-1[.] * * *  The

10  Company estimates the percentage-of-completion on contracts

11  utilizing hours incurred to date as a percentage of the total

12  estimated hours at project completion."  Id ¶ 96.  Plaintiffs

13  assert that Portal's 2Q 2004 10-Q contained the following

14  substantially similar statement:  "Portal follows the percentage-

15  of-completion method where reasonably dependable estimates of

16  progress toward completion of a contract can be made.  The Company

17  estimates the percentage-of-completion on contracts utilizing hours

18  incurred to date as a percentage of the total estimated hours at

19  project completion, subject to meeting agreed milestones.  In the

20  event that a milestone has not been reached, the associated cost is

21  deferred and revenue is not recognized until the milestone has been

22  accepted by the customer."  Id ¶ 107.

23         Once again, plaintiffs rely on the November 13, 2003,

24  conference call in which defendants Bain and Little talked with

25  securities analysts.  See *supra* III(B)(2)(b); FCAC ¶ 136.  And once

26  again, plaintiffs fail to explain how defendants' statements during

27  this conference demonstrate that Portal's description in its form

28  10-Qs of the SOP 81-1 accounting method or of the percentage of

completion accounting method was false.  Plaintiffs summarily point to Portal's disclosure in its FY 2004 SEC filings that "[t]o date, Portal has had no contracts accounted for under SOP 81-1."  Id ¶ 137.  But this statement means nothing unless plaintiffs particularly allege that Portal did in fact have some contracts that should have been accounted for under SOP 81-1.  Accordingly, these statements do not support a claim under section 10(b).

**e**

Plaintiffs also point to Portal's statements to the SEC in late 2005 in which Portal claims to be "currently evaluating" whether accounting deficiencies "could have impacted its quarterly financial statements in Fiscal 2004."  Doc #146 (Request for Judicial Notice) at 3 (form 8-K).  Based on this statement, plaintiffs ask the court to infer that "Portal acknowledged accounting errors during the Class Period."  Id.  But no such inference is warranted.  Even if Portal had made accounting errors affecting its quarterly financial statements, which is not clear based on the language on which plaintiffs rely, plaintiffs have not created a strong inference that defendants acted with scienter when making those statements.  The court cannot make this inferential leap without further particularized allegations.

//
//
//
//
//
//

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

f

Finally, plaintiffs contend that Portal's 1Q 2004 10-Q and 2Q 2004 10-Q each contained three separate false statements relating to Bain's and Little's certifications of the information contained in the 10-Q's and of the general soundness of Portal's business.  First, the form 10-Q's included the following language, as required by the Sarbanes-Oxley Act:  "[T]he Company's management, including its chief executive officer and chief financial officer, has evaluated the effectiveness of the Company's disclosure controls and procedures. * * *  Based on that evaluation, the Company's chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective * * * to ensure that information required to be disclosed * * * is recorded, processed, summarized and reported * * *."  FCAC ¶ 140.  Second, the form 10-Qs each stated that they do "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report" and that the "financial information" included in each form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows" of Portal for the reported quarter.  Id ¶ 141.  Finally, the form 10-Qs both stated:  "The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."  Id ¶ 142.

//

//

32

United States District Court

For the Northern District of California

1    Plaintiffs allege that each of these certifications was
2  false when made because defendants were aware or recklessly
3  disregarded that Portal's financial statements were not created in
4  accordance with GAAP and that Portal's internal controls were
5  ineffective.  Id ¶ 143.  To support this allegation, plaintiffs at
6  oral argument noted a September 2, 2004, conference call in which
7  Little stated to securities analysts that some work had been
8  performed on an existing contract with Vodaphone Japan without
9  first obtaining signed customer approval of the extra cost.
10 Plaintiffs allege that defendants' failure to disclose earlier that
11 it was performing work before obtaining customer signatures, as
12 required by GAAP, made the three contested certifications false
13 when made.  Id ¶ 147.  But the FCAC makes clear that this
14 conversation addresses only "results for the quarter ended July 31,
15 2004;" indeed, plaintiffs present this phone conversation as
16 evidence that "Portal's internal control deficiencies existed <u>even</u>
17 <u>well after the end of the class period</u>."  Id ¶ 144 (emphasis
18 added).  Hence, it does not appear that this allegation bears on
19 the allegedly fraudulent statements that Portal made earlier and
20 that form the basis of plaintiffs' claims.  And in any event,
21 plaintiffs again have failed to allege with particularity how these
22 allegedly fraudulent acts affected Portal's bottom line or
23 specifically caused any decline in stock price.  Accordingly, the
24 allegedly fraudulent certifications do not form a basis for a
25 section 10(b) claim.
26 //
27 //
28 //

33

United States District Court

For the Northern District of California

1

CONCLUSION

2      As with the press releases, plaintiffs have not put forth

3 sufficiently particularized allegations, even when viewed in

4 combination, to demonstrate that Portal's 1Q 2004 10-Q and 2Q 2004

5 10-Q contained materially false statements and that defendants

6 acted with scienter when making those statements.  Accordingly,

7 plaintiffs have failed to state a claim under section 10(b) and

8 Rule 10b-5 regarding statements in the 10-Q reports.

9      Because plaintiffs have not stated a claim under section

10 10(b) for any of the allegedly fraudulent statements, the court

11 GRANTS defendants' motion to dismiss on plaintiffs' section 10(b)

12 claim.

13

14                              C

15      Section 20(a) provides for "controlling person"

16 liability.  15 USC § 78t.  To establish such liability, plaintiffs

17 must first demonstrate a "primary" violation under section 10(b).

18 In re Copper Mountain, 311 F Supp 2d at 883.  "[I]n the absence of

19 a viable claim under Section 10(b), any remaining Section 20(a)

20 claims must be dismissed."  Id.  Because plaintiffs have failed to

21 state a claim under section 10(b), plaintiffs have "no basis upon

22 which to premise a Section 20(a) claim."  Id.  Accordingly, the

23 court GRANTS defendants' motion to dismiss plaintiffs' section

24 20(a) claim.

25 //

26 //

27 //

28 //

34

IV

In sum, the court DENIES defendants' motion to dismiss plaintiffs' claims under sections 11, 12(a)(2) and 15 of the '33 Act and GRANTS defendants' motion to dismiss plaintiffs' claims under sections 10(b)and 20(a) of the '34 Act.  Because plaintiffs have amended their claims four times but still have not satisfied the PSLRA's heightened pleading requirements, plaintiffs' claims under the '34 Act are hereby DISMISSED with prejudice.  The parties are instructed to appear before the court to discuss what issues, if any, remain in this litigation on October 3, 2006, at 9:00 AM.


IT IS SO ORDERED.


VAUGHN R WALKER
United States District Chief Judge

**United States District Court**
For the Northern District of California

35